IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-05-226-6 |
| | § | CIVIL ACTION NO. H-10-1060 |
| YERISOIBI FLORENCE HAMILTON, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Yerisoibi Florence Hamilton's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 344),[1] the United States' Response and Motion to Dismiss Movant's § 2255 Motion (Document Nos. 361, 362), and Movant's Responses to the United States' Motion to Dismiss § 2255 Motion (Document Nos. 365, 366, 381). After reviewing Movant's § 2255 Motion, the Government's Response and Motion to Dismiss, and Movant's Responses to the Government's Motion to Dismiss, the record of the proceedings before the District Court in the underlying criminal case and on appeal, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 362) be GRANTED, and that Movant Yerisoibi Florence Hamilton's § 2255 Motion (Document No. 344) be DENIED.

---

[1] Yerisoibi Florence Hamilton's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-10-1060 and at Document No. 344 in Criminal Action No. H-05-226.

## I.      Procedural History

Movant Yerisoibi Florence Hamilton ("Hamilton"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255.  This is Hamilton's first attempt at § 2255 relief.

On May 18, 2005, Hamilton was charged by Indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 (Count 1), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 2), aiding and abetting bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Count 3), and money laundering in violation of 18 U.S.C.  § 1956(a)(1)(B)(I)  (Counts 4-7). (Document No. 1).  Also charged in the Indictment were Noman Tabani, Mehmood Nazarani, Faisal Saeed Khan, Ahmed Shah, Maged M.  Abuzaid, and Igbanibo C.  Nathan.  On February 20, 2007, Hamilton was found guilty by jury verdict on all counts charged in the Indictment.  (Document No. 180).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared to which Hamilton filed written objections.  (Document No.  232).  In addition, the Government moved for an obstruction of justice adjustment (Document No. 292), to which Hamilton responded.  (Document No.  295).[2]  Pursuant to the PSR, Hamilton's advisory guideline sentencing range was calculated as

---

[2] According to the Government, Hamilton's trial testimony about the purchase of the Mesa Drive warehouse constituted perjury.  In support of this contention, the Government pointed to Hamilton's testimony that she had been instructed by Steve Williams to change the title commitment issued by Chicago Title to reflect that title was vested in American Traders Enterprises and to remove the GF number.  The Government argued that Hamilton's testimony was contradicted by the testimony of Steven Williams.  The Government also pointed to Hamilton's testimony about Igbanibo Nathan.  Hamilton testified that she did not know that Nathan was involved in providing funds for the 1st American transaction.  In her response to the Motion, Hamilton denied that she had perjured herself at trial.  Judge Harmon granted the Government's request to add two levels to Hamilton's adjusted base offense level.  With an adjusted base offense level of 29, and a criminal history category of I, Hamilton had an advisory

follows: (1) Hamilton had a base offense level of 20 under U.S.S.G. § 2S1.1.  (2) Because the value

of laundered funds was $1,186,730.35, Hamilton's offense level was increased by 5 levels pursuant

to U.S.S.G. § 2S1.1(b)(2)(F).  (3) Because Hamilton abused a position of trust which significantly

facilitated the commission or concealment of the offense, her offense level was increased by 2 levels

under U.S.S.G. § 3B1.3. On November 30, 2007, Hamilton was sentenced to a total term of

imprisonment of 96 months, to be followed by a 5 year term of supervised release, and a special

assessment of $700.00.  (Document No.  296). Judgment was entered on December 17, 2007.

(Document No.  298).

Hamilton appealed her conviction to the Fifth Circuit Court of Appeals.  Unpersuaded by the

arguments raised by Hamilton, the Fifth Circuit affirmed her conviction. (Document Nos. 316, 318).

The Fifth Circuit wrote:

> Igbanibo Nathan and Yerisoibi Hamilton were convicted of multiple counts of bank
> fraud and money laundering in connection with a land flip scheme.  *See United States
> v. Sallee,* 984 F.2d 643, 644 n.1 (5th Cir.  1993) (providing a detailed example and
> explanation of a generic land flip scheme).  Hamilton and Nathan were the escrow
> agent and the "hard money" lender, respectively, for this land flip.  The district court
> sentenced Nathan to sixty months imprisonment and three years supervised release.
> Hamilton was sentenced to ninety-six months imprisonment and five years supervised
> release.  They now appeal their convictions, and Nathan appeals his sentence.  For the
> reasons stated below, we AFFIRM.
>
> Nathan and Hamilton both acknowledge that their services were used in a scheme to
> defraud Banco Popular.  They argue, however, that the Government did not prove
> that they had the knowledge and specific intent to commit the bank fraud and money
> laundering counts with which they were charged.  Sufficiency of the evidence
> supporting a conviction is viewed in the light most favorable to the jury verdict, and
> this court determines only whether "any rational trier of fact could have found the
> essential elements of the crime beyond a reasonable doubt." *United States v. Sprick,*
> 233 F.3d 845, 852 (5th Cir.  2000) (internal quotation marks omitted).  At trial, the
> Government introduced evidence that Hamilton had altered documents during the

---

guideline range of 87 to 108 months.

closing, that Nathan had instructed lenders to make out checks to a third party, that both appellants had been involved with similar transactions in the past, and that Appellants profited from the disbursement of escrow funds at closing to their jointly-owned companies.  Based on the strength and nature of this and other circumstantial evidence described in the record, it was reasonable for the jury to infer that Appellants knew of and had the specific intent to commit the charged crimes.

Nathan and Hamilton also objected to the "deliberate ignorance" instruction given to the jury, arguing that it did not require the jury to find that both of them possessed subjective awareness of the illegality.  Because they did not object at trial, this court reviews for plain error.  The instruction allowed the jury to find that the defendants had knowledge if jurors found that "the defendant deliberately closed his eyes to what would otherwise have been obvious to him" or "deliberately blinded himself to the existence of a fact."  This court has noted that these types of instructions should rarely be given, but can be justified where "a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Bieganowski*, 313 F.3d 264, 289 (5th Cir.  2002) (internal quotation marks omitted).  Given the facts presented at trial, including the evidence that Appellants had participated in other similarly-executed land flip transactions, the Appellants cannot establish that the Court's use of this instruction was a marked departure from our past cases.  *See, e.g., United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990).

Nathan appeals the admission of evidence and the prosecutor's closing argument regarding his immigration status.  Because Nathan did not request a limiting instruction or object, we review for plain error only.  Nathan had the burden of establishing that allegedly improper remarks in the closing argument were substantial and cast serious doubt on the correctness of the jury's verdict.  *United States v. Mares*, 402 F.3d 511, 515 (5th Cir.  2005) (citing *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir.  2001)).  Nathan also had to show that improper evidence was introduced and that "the need for [a limiting] instruction [was] obvious and the failure to give it [was] so prejudicial as to affect substantial rights of the accused." *United States v. Waldrip*, 981 F.2d 799, 805 (5th Cir.  1993) (internal quotation marks omitted).  On direct examination, Nathan described his marriage and reasons for coming to the United States.  Hamilton and Nathan were both natives of Nigeria, married each other in the late 1970's, came to the United States in 1982, divorced in 1994, remarried American citizens, divorced those citizens in 2000 or 2001, gained American citizenship in 2001, and remarried one another in 2001.  Even while divorced, they continued to have a close relationship.  Nathan worked down the hall from Hamilton, co-owned two businesses with her, and recommended her to be the escrow agent for this transaction.  The relationship between Nathan and Hamilton, therefore, was central to the question whether they had knowledge of the conspiracy, and any error was invited by Nathan's statements on direct examination.  *See United*

4

*States v. Tullos*, 868 F.2d 689 (5th Cir. 1989).

Finally, Nathan argues that the district court erred when it assessed the loss for sentencing purposes using the purchase price of the collateral in 1998 instead of a 2000 bank appraisal. He did not object at the time of sentencing and therefore, this court reviews for plain error. The Application Note 3(E)(ii) to U.S.S.G. § 2B1.1 states that any loss amount shall be reduced by "the fair market value of the collateral at the time of sentencing" if the collateral has not been disposed of by that time. At the time of sentencing in 2007, there is no evidence that the property had been sold and no current appraisal was presented.

Under plain error review, the error must be obvious and "evident from a plain reading of the statute." *See United States v. Aderholt*, 87 F.3d 740, 744 (5th Cir. 1996). Assuming that the district court incorrectly used the 1998 purchase price instead of the 2000 appraisal, the error was not clear and obvious. Neither side points to any further guidance in the text of the Guidelines or any precedent that states whether a more recent figure is preferable when a current appraisal is not available. We have said, however, that where "the district court cannot achieve absolute certainty in determining the lenders' losses ...'[t]he court need only make a reasonable estimate of the loss.'" *United States v. Goss*, 549 F.3d 1013, 1019 (5th Cir. 2008) (quoting *United States v. Holbrook*, 499 F.3d 466, 468 (5th Cir. 2007) (matching the language of both U.S.S.G. 2B1.1 app. n.2(c) (2001) and U.S.S.G. 2B1.1 app. n.3(C) (2007)). Because the 1998 purchase price was a reasonable estimate of the property's value when no appraisal contemporaneous or near to the date of sentencing was available, the district court's application of U.S.S.G. 2B1.1 was not plainly wrong. (Document No. 316; *United States v. Nathan*, 318 Fed. App'x 273 (2009) (footnotes omitted).

Within one year of her conviction being final, Hamilton timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 344). Hamilton raises several claims of ineffective assistance of counsel. According to Hamilton, her counsel was constitutionally ineffective for failing to investigate and call witnesses to testify; failing to object to the Government's motion to attach two unrelated transactions to the Indictment, which were used to increase her sentence level; failing to review documents that she gave him; failing to request a new jury; and failing to not win an acquittal since she was actually innocent of the charges alleged in the Indictment. With respect to appellate counsel, Hamilton alleges that her counsel was ineffective for failing to raise trial

counsel's ineffective representation on direct appeal.  In addition to her ineffective assistance of counsel claims, Hamilton claims that the evidence was insufficient to support her convictions. Hamilton also claims that several of the Government's witnesses testified untruthfully at trial; that the jury was biased; that the Government withheld exculpatory evidence; and that she was legally innocent of the money laundering offenses based on the reasoning of *United States v.  Santos*, 553 U.S. 507 (2008).

The Government, in its Motion to Dismiss (Document No.  362) argues that Hamilton's  § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Hamilton is not entitled to relief.  According to the Government, Hamilton has not shown that her counsel either at trial or on appeal was deficient nor has she shown she was prejudiced by the alleged errors.  As to her remaining claims, the Government contends that Hamilton is not entitled to relief.

The background facts relevant to Hamilton's claims are set forth in the offense conduct section of Hamilton's PSR.  The PSR states in pertinent part:

8.  The SBA is an agency of the United States established by Congress through the Small Business Act of 1953 to provide financial, technical, and management assistance to qualified small businesses.  Mohammad Farooq Samad was a loan broker, who was involved with a number of SBA guaranteed loans which went into default, and, as a result, the SBA barred him, in or about late 1999, from originating further SBA guaranteed loans.  Consequently, Samad then began referring loan borrowers to other brokers, including Noman Tabani.  Samad is currently serving 108 months in federal prison for conspiracy and bank fraud.

9.  In 2001, the SBA initiated an investigation which focused on Tabani.  Information indicated that Tabani was fraudulently brokering SBA guaranteed loans to finance property flips at inflated prices.  The investigation revealed that in 2000, Tabani, in concert with others, fraudulently secured more than $5 million in loans from federally insured financial institutions, which were guaranteed by the SBA.  Although a number of suspicious loan transactions were identified, the investigation was limited to four loans.  These loans were referred to as 1st American Trading Company Inc., Blum Mart Inc., Waller Minimart Inc., and Hardin Food Mart Inc.  Banco Popular was the

lender on three of the loans.  Bank United funded the fourth loan for Blum Mart Inc.
The loans were all funded between May and September 2000.  It was noted that
Faisal Saeed Khan was involved in one loan, 1st American Trading Company Inc.
**Florence Hamilton** and Igbanibo C. Nathan were criminally involved in three of the
loans, 1st American Trading Company, Inc., Blum Mart Inc., and Waller Minimart,
Inc.  Although **Florence Hamilton** was also the escrow officer for the Hardin Food
Mart Inc.  loan, according to the Government, there is no evidence that she was
criminally involved with this fraudulent loan.

### 1st American SBA Loan (funded May 19, 2000)

10.   Mehmood Nazarani, a/k/a Ali Nazarani, and Faisal Saeed Khan owned and
operated a used clothing exportation business which purchased, packaged and resold
the clothing in bulk to other countries.  The name of the business was 1st American
Trading Company.  In early 2000, Nazarani and Khan, who had been looking for
more warehouse space for their business, entered into an agreement to purchase a
warehouse located at 7413 Mesa Drive, in Houston, for $1.5 million.  Nazarani
contacted Samad, who was a real estate mortgage broker in their community.  Samad
in turn referred Nazarani to another real estate mortgage broker, Noman Tabani, who
helped Nazarani and Khan secure a SBA loan for the purchase of the warehouse and
additional funding for building improvements and working capital.  Because 1st
American lacked the sufficient funding for a down payment on the loan, Tabani
devised a plan for 1st American to borrow the down payment, purchase price and
additional amounts for working capital and improvements.

11.  On March 7, 2000, Nazarani and Khan completed and signed the initial SBA loan
application, misrepresenting on the application that the market value of the Mesa
Drive warehouse was $2.2 million.  Nazarani and Khan reported they would put up
$400,000 cash as a down payment, thus, the purchase price was reported as $1.8
million, rather than the actual purchase price of $1.5 million.  Additional funding was
requested for building improvements and working capital for a total loan application
request of $2.4 million.  As part of the loan agreement, it was represented that
Nazarani and Khan would provide an equity injection of 20% of the total cost of the
$2.4 million loan, or $600,000.  (This included the $400,000 cash down payment.)

12.  Tabani, through his father, referred the SBA loan application to Banco Popular,
which paid a $24,000 referral fee to Tabani's father.  According to the government,
Banco Popular conducted an independent appraisal of the Mesa Drive warehouse
which showed that the property was valued at $3 million, which was more than the
loan amount.  (This fact is also stipulated to in Faisal Khan's plea agreement, which
further states there is no evidence to show that the appraisal was fraudulent or
influenced by Khan.)

13.  Prior to the closing, **Florence Hamilton**, who was the Chicago Title escrow officer involved in the transaction, forwarded a false and forged purchase contract reflecting that Nazarani and Khan were purchasing the warehouse from MTGRP Investors, LP, for $2.2 million.  The fraudulent contract was faxed to the seller's representative, Andy Waldman, prior to the closing.  Waldman called **Hamilton** upon realizing the contract had been falsified and forged.  Waldman told **Hamilton** the sales price was $1.5 million that the MTGRP's signature had been forged on the contract.  **Hamilton** responded by initially stating that this was the contract she had been given, and then told Waldman that the buyer was flipping the property to an associated party and needed the excess funds to make repairs.

14.  According to Nazarani and Khan's real estate agent, Roberson, when he later questioned Nazarani and Khan about the fraudulent and forged purchase contract **Hamilton** had faxed to the sellers, Nazarani and Khan blamed the error on Tabani, their mortgage broker.

15.  In order to "flip" the property, Khan and Nazarani recruited their family members into the scheme to act as straw purchasers then sellers.  On April 1, 2000, Ahmed Shah, Khan's younger brother, and Anjuman Dhannani, Nazarani's wife, signed a Partnership Agreement to form American Traders Enterprises.  American Traders was formed to buy the warehouse property for $1.5 million from MTGRP and then simultaneously "flip" the property to 1st American (Nazarani and Khan) for $2.2 million.

16.  On April 14, 2000, Nazarani sent a fax to Roberson, 1st American's real estate agent, and instructed him to change the name of the purchaser on the $1.5 million sales contract to American Traders Enterprises (in place of 1st American Trading.) It is noted that the $20,000 earnest money deposit required by MTGRP as part of the sale was paid by 1st American for American Traders.

17.  Khan submitted and signed a fraudulent purchase contract to Banco Popular which stated he was actually purchasing the warehouse from American Traders for $2.2 million.  Khan misrepresented that 1st American was paying $400,000 cash towards the purchase price and that the remaining $1.8 million would be financed. Shah signed the false purchase contract on behalf of the seller, American Traders.

18.  On May 19, 2000, Nazarani and Khan signed the loan agreement with Banco Popular agreeing that they would use $1.8 million of the $1,846,469 disbursement to purchase the warehouse.  Nazarani and Khan also signed a settlement statement representing that 1st American was purchasing the warehouse from American Traders for $2,200,000 (with Nazarani and Khan providing $400,000 of the funding.)

19.  On May 19, 2000, **Hamilton** performed a fraudulent double escrow closing.

**Hamilton** misrepresented the $1.5 million sale from MTGRP to American Traders as a "cash deal" on the HUD-1 Settlement Statement.  In fact, American Traders did not pay any funds towards the purchase of the property.  **Hamilton** settled the first sale with MTGRP, by allowing 1st American to fund the $20,000 earnest money deposit on behalf of American Traders; and by transferring 1st American's loan proceeds to American Traders.

20.  On May 22, 2000, **Hamilton** faxed a copy of the HUD-1 Settlement Statement on the second sale between American Traders and 1st American to Banco Popular.  **Hamilton** misrepresented that approximately $375,283 in cash had been received by 1st American, by providing copies of cashiers checks as evidence.  **Hamilton** deposited these cashiers checks into the escrow account.

21.  The investigation later determined that Tabani had arranged for Maged Abuzaid, a business associate of Tabani's, to purchase the three cashiers checks totaling approximately $375,000, and to list 1st American as the purchaser.  Abuzaid recruited unsuspecting friends for funding.  Bank records also showed that some of these funds were obtained from Farooq Samad, who had originally referred Nazarani and Khan to Tabani.

22.  On May 23, 2000, Banco Popular wired loan proceeds totaling approximately $1,846,469 to Chicago Title's escrow account to partially fund the 1st American loan.  **Hamilton** issued a sales proceeds check from the escrow account to American Traders for $*666,928*.  Bank records showed the check was cashed at Sterling Bank, where American Traders had opened an account.  Consequently, on behalf of American Traders, Khan's younger brother Shah purchased two cashiers checks, one for $225,000 made payable to Abuzaid, and one for $150,000 made payable to Abuzaid's friend, Solomon George.  This was reimbursement for the $375,000 in cashiers checks purchased to falsify the borrower's required equity injection.  Shah disbursed $260,000 to Nazarani and Khan and $17,000 to himself.

23.  **Hamilton** also disbursed $*35,950* to herself and Nathan under the guise of a real estate consultation fee and a "document research" fee.  **Hamilton** placed a fictitious invoice in the escrow file, which was dated May 12, 2000, and billed from Security Mortgage Company (SMC) to American Traders for $35,000.  **Hamilton** then issued an escrow check for $35,000 payable to SMC.  The check was deposited into the SMC account at Sterling Bank.  The account's co-signers were **Hamilton** and Igbanibo Nathan.  (Nathan and **Hamilton** were not married at the time).  This same date, May 23, 2000, Nathan transferred $12,000 to Abuzaid and $13,000 to Samad from the SMC account.

24.  Two additional fictitious invoices from Temple Southland Corporation, one for $650, billed to American Traders, and one for $300, billed to 1st American, were

placed in the escrow file.  On May 23, 2000, **Hamilton** issued an escrow check payable for $*950* to Temple Southland Corporation.  The investigation determined **Hamilton** and Nathan controlled the account in the name of Temple Southland Corporation.

25.  On July 3, 2000, Nazarani faxed a copy of the construction contract for 1st American to Banco Popular.  The contract reflected that Falcon Construction Company agreed to do contract work on the Mesa Drive warehouse for the sum of $315,000.  Subsequently, Nazarani sent false invoices of the construction work to Banco Popular.  Thus, construction loan proceeds were disbursed to 1st American totaling $315,000.  The investigation later determined that the owner of Falcon Construction, Mohammed Feroze, was a friend of Khan's who had agreed to pretend to be Khan and Nazarani's contractor as a personal favor to Khan.  Although 1st American did have construction repair work done at the warehouse by another contractor, the total bill only amounted to $153,000.

26.  Between June 2000 and June 2001, Nazarani and Khan also received construction loan disbursements of $315,000 and working capital loan disbursements for salaries and inventory totaling $385,000 from Banco Popular as part of the SBA loan.  Bank account records showed that Nazarani and Khan misused $151,419 of these proceeds for personal expenses which were not permitted under the loan Authorization.  It is noted that Nazarani used the majority of the money for personal expenses which included cash withdrawals, payments on credit cards and the purchase of a new vehicle.  A total of $18,500 was wire transferred overseas to Pakistan and South America.  Khan purchased a cashiers check for $20,000 made payable to Farooq Samad.

27.  1st American made irregular monthly payments on its SBA loan until May 2003, at which time it went into default.  1st American forfeited its corporate charter in November 2003.

28.  In February 2006, Khan sold the Mesa warehouse property for approximately $2,550,000 and paid the loan to Banco Popular in full.

29.  By May 2006, upon indictment, Tabani and Nazarani had left the United States. They remain fugitives.

30.  Pursuant to U.S.S.G. § 2F1.1, comment.  (n.  8(c)), in fraudulent loan applications, the loss is the actual loss to the victim or the expected loss if an actual loss has not yet come about.  Thus, if a defendant misrepresents the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered from assets pledged to secure the loan.  However, if the intended loss is greater than the actual

loss, the intended loss should be used. In the instant offense, Khan and Nazarani did misrepresent their assets. However, because Banco Popular appraised the warehouse property for $3,000,000, which was at a greater value than the loan amount, there is no intended loss for guideline calculation purposes. The fraud did involve more than minimal planning.

31.  With respect to the amount of funds laundered, **Hamilton** and Nathan are responsible for aiding in the laundering of at least $521,450 in fraudulently obtained funds as depicted below.

32.  On May 23, 2000, Banco Popular wired 1st American's loan proceeds, totaling $1,846,469.16, to the escrow account. **Hamilton** then disbursed $666,928.66 from the escrow account to American Traders. Shah, acting on behalf of American Traders disbursed *$225,000* to Abuzaid, and obtained two cashiers checks in amounts of *$111,000* and *$138,000* made payable to American Traders. Nazarani took these cashiers checks and deposited them into a 1st American account which he controlled with Khan.

33.  Also on May 23, 2000, **Hamilton** disbursed *$35,950* from the escrow account to SMC, a company she and Nathan controlled, under the guise of a real estate consultation and research fee. Nathan then disbursed $12,000 of the *$35,950* to Abuzaid. On June 6, 2000, Shah obtained a cashiers check in the amount of *$2,500* made payable to his brother, Khan. On June 30, 2000, Shah obtained a *$10,000* cashiers check made payable to himself.

Blum Mart, Inc., (funded June 29, 2000).

34.  In late Summer of 1999, Hasan Chowdhury, his brother, Duke Khan, and Farooq Samad negotiated to buy a gas station business and its real estate in Blum, Texas, for a total price of $390,000. The Baldwins owned the business and A.J. Lambert, of Lambert Oil, owned the real property on which the business was located. The initial contract showed the buyer listed as "Galaxy Marketing Services and or assignee." On September 9, 1999, Samad instructed the seller's attorney to change the initial contract's listed buyer to Duke Khan's company, Rio Vista Minimarts Inc. Duke Khan then signed two sales contracts (one for the business and one for the property) on September 15, 1999.

35.  In order to "flip" the property, Habib Murshed recruited Assad Chowdory to secure a $750,000 SBA guaranteed loan from Bank United to purchase the Blum Mart business and property from Duke Khan's company, Rio Vista Minimarts Inc. When Assad Chowdory told Murshed he did not have any money in the bank to purchase the property, Murshed told Assad Chowdory that Farooq Samad would help him with the financing. Samad subsequently had Assad Chowdory sign a blank

personal financial statement. Samad told Assad Chowdhury that he would fill in the information later. When Assad Chowdory questioned why he should pay $600,000 for a property that was sold for $390,000, Murshed advised Assad Chowdory that he could sell the property for a much greater amount. Assad Chowdory later told case agents he reluctantly agreed to purchase the property for eventual resale as he needed the money, and Samad was willing to help him arrange financing. Assad Chowdory then formed Blum Mart Inc., in order to purchase the property from Rio Vista Minimarts, Inc.

36. On January 1, 2000, Tabani, who was the loan broker, referred the deal to Bank United. Tabani submitted a fraudulent loan application and false purchase contract to Bank United to secure a $750,000 loan to Blum Mart, Inc. Tabani also submitted fraudulent documents and cashiers checks to Bank United which misrepresented Blum Mart's Inc.'s equity injection.

37. In early April 2000, Assad Chowdory went to Samad's office and saw paperwork showing a sale price of $900,000 for the Blum property. When Assad Chowdory questioned Samad, Samad explained that in order to guarantee that they receive $600,000, they had to apply for a $900,000 loan, as the bank always approved less than requested. Samad told Assad Chowdory that he would be interviewed by Bank United, and that Assad Chowdory was to say the loan request was for $900,000 and had been arranged by his broker, Tabani. Assad Chowdory was also told to falsely represent that he had $130,000 in his bank account to be invested in Blum Mart property.

38. On April 9, 2000, Assad Chowdory met with Samad, Murshed, Tabani and Duke Khan. Samad asked everyone to buy cashier checks made payable to the Baldwins in whatever amounts they could afford, in order to come up with Assad Chowdory's required borrowers equity cash injection of $100,000. The cashier checks were then copied and faxed to Samad, then redeposited back into the original bank accounts. On April14, 2000, Tabani provided the copies to **Hamilton** who faxed the financial documents to Bank United in order to make it appear that the borrower's required equity injection was in the escrow account.

39. On June 16, 2000, A.J. Lambert and his attorney met with Blum Mart Inc., which was represented by Chowdhury, Samad and Murshed, to sign the closing documents. The seller's attorney, Lummus, questioned the inflated sales price of $900,000 rather than the agreed upon $390,000. Lummus called **Hamilton**, who was the acting escrow officer, to inform her that the price was incorrect and that his client could not sign the contract. **Hamilton** initially told the attorney that she already had in her possession signed contracts from the seller showing the $900,000 price. When the attorney advised the documents were forged, as the seller had never signed a contract for $900,000, **Hamilton** stated she would call Bank United and let them know the

12

sales price had changed.  The attorney advised the seller not to sign the false contract, and the meeting ended.

40.  When the sellers A.J.  Lambert and Mrs.  Baldwin refused to sign the sales contract, Chowdhury, Samad and Murshed formed a "shell" corporation, called "Lamberta Oil Company, Inc.  (Lamberta.)" Duke Khan then opened a bank account in "Lamberta's" name.

41. On June 20, 2000, Lummus called **Hamilton** and inquired about the status of the Blum Mart sale.  **Hamilton** advised she was still discussing the matter with the lender's attorney as the broker had not been truthful.

42. On June 20, 2000, **Hamilton** faxed a fraudulent contract to Bank United which showed Blum Mart Inc.  was purchasing the Blum Mart property from "Lamberta" for $900,000.  In order to explain the sudden change in the seller, Bank United was told that "Lamberta" was a subsidiary company of the original seller, A.J. Lambert's company, Lambert Oil.  **Hamilton** never told Bank United about the double escrow closing nor did **Hamilton** tell Bank United about the forged signatures of Mrs. Baldwin and A.J. Lambert on the initial purchase contracts.

43.  On June 23, 2000, a representative from Bank United, Tabani, **Hamilton**, and Assad Chowdory and his wife attended the closing conference at Chicago Title.  The sellers did not attend.  **Hamilton** later provided Bank United with the closing documents from "Lamberta" signed by Catherine Fontenot, who was really an employee of Murshed's and had been asked to act as the Vice President of "Lamberta."  Fontenot subsequently told case agents that Murshed promised her a promotion if she would assist him in this transaction.  Fontenot also stated that, at the closing, Hamilton never asked her for a check, but rather showed her where to sign on the signature pages of two documents.

44. On June 23, 2000, **Hamilton** faxed closing documents to Lummus, A.J. Lambert and Mrs.  Baldwin, which included a HUD-1 settlement statement reflecting a cash transaction and sales price of $390,000; and an Assignment of Contract which transferred the purchasing right from Rio Vista Minimarts Inc, to "Lamberta."  Case agents noted that the Assignment of Contract was dated June 15, 2000, which was one day prior to the formation of "Lamberta Oil Company, Inc."  Baldwin and A.J. Lambert signed the closing documents, although A.J. Lambert was uneasy about the buyers utilizing a name similar to his company's to buy the Blum Mart property.

45.  **Hamilton** submitted a signed Commitment of Title Insurance issued on June 21, 2000, but effective as of May 26, 2000, to Bank United.  This Commitment falsely represented that the "Lamberta Oil Company, Inc." had title to the Blum Mart property since the effective date of May 26, 2000.  **Hamilton** knew this was a false

statement as "Lamberta" did not purchase the property until June 23, 2000. (According to Bank United, the Title Commitment is heavily relied upon as it ensures the lender that the entity selling the real property has legal title to transfer it to the borrower). **Hamilton** also submitted a false Title Commitment to Bank United which showed a fraudulent purchase contract in the amount of $900,000 for the Blum Mart property and that the borrower, Blum Mart, Inc., was securing a mortgage for $750,000.

46.  On June 27, 2000, **Hamilton** deposited two cashier checks totaling $40,000 from Abuzaid, in the escrow account.  Abuzaid had listed the purchaser of the checks as Blum Mart Inc.  **Hamilton** then falsely reported to Bank United that she had only received $21,600 from Blum Mart Inc., and that a "Seller's Credit" of $68,400 was given to Blum Mart, Inc.  which satisfied the required $100,000 equity injection.

47.  On June 29, 2000, based on the misrepresentations, Bank United wire transferred proceeds totaling $707,914.38 to the escrow account to fund the Blum Mart loan. In addition to the $40,000 in deposits from Abuzaid, the escrow account also held a $2,000 earnest money deposit made by Duke Khan.  All total, the escrow account held $749,914.38.  Case agents determined that **Hamilton's** double escrow closings allowed the conspirators to receive fraudulent disbursements totaling $339,430.35.

48.  **Hamilton** laundered the $*339,430.35*, by disbursing $275,000 and $20,000 to Tabani.  The checks were made payable to entities Tabani controlled, i.e., Pieco, Inc. and Suncoast Company.  Tabani then disbursed some of these funds to others including Abuzaid and Murshed.  **Hamilton** disbursed $12,000 to SMC, and made disbursements of $900 and $950 to Temple Southland.  **Hamilton** and Nathan controlled both companies.  **Hamilton** disbursed $2,000, recorded as a legal fee to an individual named Altaf Adam (later identified as Samad's attorney); $20,185.85 to Duke Khan and $8,394.50 to Assad Chowdory.

49.  Ultimately, Assad Chowdory defaulted on the Blum Mart loan, resulting in an outstanding principal loan balance of $748,573.79 to Bank United (now Washington Mutual Bank).  However, this does not consider the recovered value of the collateral property, which was $111,004.38.  Thus, the estimated loss to Bank United (Washington Mutual) is the loan amount at default of $748,573.79, less proceeds recovered of $111,004.38, for a total loss amount of $637,569.41.

50.  On October 26, 2000, four months after the closing and six days after **Hamilton** learned of the Office of Inspector General investigation, **Hamilton** disbursed additional escrow funds of $*350* to her Temple Southland account in order to have the property deed recorded in the Will County Clerk's Office.  **Hamilton** then had the Blum Mart property deeds recorded in the County Clerk's Office on November 15, 2000, and falsely notarized the Special Cash Warranty Deed by stating that the Vice

President of Lamberta Oil Company, Inc., Catherine Fontenot, appeared before her on November 13, 2000, to transfer the Blum Mart property from Lambert Oil Company to Lamberta Oil Company.

Waller Minimart Inc., (funded July 7, 2000)

51.  Murshed owned an Exxon gas station and convenience store in Waller, Texas, which he wanted to sell.  In early 2000, Murshed and Abu Naser recruited Mohammad Rahman to apply for a SBA guaranteed loan and buy Murshed's gas station for $1.5 million.  The loan application had already been completed by Samad, when Rahman first came from New York to meet with Murshed, Samad and Tabani.

52.  Samad instructed Rahman to tell Banco Popular during the upcoming loan interview that he [Rahman] had convenience store experience and that he had received the $160,000 required equity injection from relatives.  Paperwork was filed to falsely represent that Rahman had ownership and control over Waller Minimart, Inc., in order to purchase the property.  The address used to incorporate Waller Minimart, Inc., belonged to Abu Naser.

53.  Tabani, acted as the loan broker and **Hamilton** acted as the escrow officer.  The SBA loan authorization required Waller Minimart to make a cash injection of at least $200,000 into the business as equity capital.  In order to come up with the majority of the equity injection, Igbanibo Nathan contacted Solomon George and advised George that he could make $9,000, if George made a short-term loan of $150,000 to Waller Minimart, Inc.  Nathan instructed George to purchase a cashiers check for $150,000 made payable to Chicago Title and list the purchaser as Waller Minimart.  A second cashiers check for $31,570 was purchased by Murshed.

54.  On May 12, 2000, Banco Popular approved the $1,000,000 loan and SBA approved a guaranty of 75%.

55.  On June 30, 2000, **Hamilton** submitted a fraudulent HUD-1 Settlement Statement to Banco Popular which reflected a real estate consultation fee of $11,000 from Hamilton's controlled company, SMC; a "pump/enviro." consultation fee of $159,000 from George's company, GEOSOL; a $10,000 consultation fee from Tabani's company, Suncoast Construction.  **Hamilton** also submitted fictitious invoices to support these reported fees. Banco Popular rejected these fees and thus, on July 7, 2000, **Hamilton** submitted a revised HUD-1 Settlement Statement which eliminated the fees.

56.  On July 7, 2000, Banco Popular authorized the funding of $1,000,000.  **Hamilton** disbursed the fraudulently obtained escrow proceeds totaling $1,135,452.40 to Murshed.  After the proceeds were deposited into Murshed's

business account, Murshed's wife purchased cashiers checks which Murshed used to pay $10,000 to Tabani; $5,000 to Naser; $100,000 to Altaf Adam; $12,500 to **Hamilton** through her and Nathan's company SMC; $39,000 to Samad; and $159,000 to George through Peter Delamora (per George's instructions as Delamora had helped George obtain the funding).   George ultimately told Nathan to keep $2,000, as George had realized a significant profit through Nathan's investment referral.   Thus, a total of $*325,500* was laundered.

57.   In 2001, Rahman defaulted on the Waller Minimart loan and filed for bankruptcy. The principal loss to Banco Popular was $987,677.11.   However, this does not consider the recovered value of the collateral property, which totaled $239,113.53. Thus, the estimated loss to Banco Popular is the loan amount at default of $987,611.11, less the recovered value of the collateral property of $239,113.53, for a total loss of $748,497.58.

58.   On October 20, 2000, case agents interviewed **Hamilton**, who stated she had closed several other deals which Tabani brokered, including Blum Mart Inc., Waller Minimart, Inc., and Hardin Foodmart.   According to **Hamilton**, Tony Rice at Banco Popular financed all of these purchases.   **Hamilton** noted she was becoming uncomfortable doing business with Tabani because she could not always get a straight answer from him, and thus she had intended to end her business relationship with him.

<u>Role of the Defendant</u>

59.   In summary, **Hamilton** is responsible for assisting in laundering a total of $1,186,730.35 (comprised of $521,450 for 1st American; $339,780.35 for Blum Mart; and $325,500 for Waller Minimart).   The fraud in this case totaled $1,386,066.99 (comprised of $0 for 1st American; $637,569.41 for Blum Mart; and $748,497.58 for Waller Minimart). The fraud involved more than minimal planning and more than one victim.   It was deemed sophisticated in that straw companies were created to fraudulently inflate the value of the property and to conceal the proceeds.   Both **Hamilton** and Nathan are viewed as average participants.   As an escrow officer, **Hamilton** held a position of trust with the lenders, Banco Popular and Bank United. She abused this trust by submitting fraudulent documents, and not disclosing the double closings or the fraudulent escrow fees which she laundered via disbursement to the co-conspirators.   (Document No.  250) (Italics and Bold in original).

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could

not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467

U.S. 1220 (1984).  The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct.  *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices."  *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition.  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) recently discussed *Strickland* in the context of a habeas proceeding involving a state conviction.  While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that there are "'countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'  Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach."  *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).   As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies.  *Harrington*, 131 S.Ct.  at 789.  "Just as there is no expectation

that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for

a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote

possibilities." *Harrington*, 131 S.Ct. at 791.  Moreover, "it is difficult to establish ineffective

assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*,

131 S.Ct. at 791 (emphasis added).  Finally, in considering the prejudice prong of *Strickland*, the

likelihood of a different result must be substantial, not just conceivable.  *Id.* at 791-792 (Citations

omitted).  As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from

*Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S.Ct. 1473, 1485 (2010)).  The Court observed:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew
> of materials outside the record, and interacted with the client, with opposing counsel,
> and with the judge.  It is "all too tempting" to "second-guess counsel's assistance
> after conviction or adverse sentence."  The question is whether an attorney's
> representation amounted to incompetence under "prevailing professional norms," not
> whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

As to the specific examples of ineffective assistance of counsel which Hamilton cites in

support of her ineffectiveness claims, such as that counsel could have and should have properly

investigated the case by contacting the legal department for Chicago Title; failing to follow up with

a phone call to Chicago Title employee Steve Williams, who according to Hamilton, "challenged Pena

from the stand"; failing to interview employees and officials of Chicago Title and calling them to

testify; failing to contact a law firm associated with Chicago Title, Banco Popular, and Bank United,

and several attorneys associated with the First American Trading Company loan and the SBA

guaranteed loans to Waller MiniMart and BlumMart such as Russell Jones, Dan McCrury, William

Allen Wirth and Chuck Lummus, the record either affirmatively shows that Hamilton's counsel was

not deficient or there is no evidence that the alleged errors prejudiced Hamilton within the meaning of *Strickland*.

Hamilton argues that counsel was ineffective because he failed to investigate the facts of the case. According to Hamilton, counsel could have and should have contacted various lawyers and law firms involved in the various loans described in the Indictment such as First American Trading Company, Waller MiniMart and BlumMart or people working at Chicago Title. Hamilton maintains that she gave counsel a list of about twenty names of individuals who would have stated that Hamilton was not engaged in prior flip transactions, that she did not own a title company, and that only a signature was required on an escrow account. The Government responds that Hamilton's ineffective assistance of counsel claim based on counsel's failure to contact witnesses is conclusional because Hamilton does not describe with specificity the nature of each uncalled witness's testimony. The Government further argues that the decision to contact and call a witness is a strategy decision.

When an ineffective assistance of counsel claim is based on counsel's failure to investigate, the Fifth Circuit has held that a movant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). The law is clear that "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001). To prevail, Hamilton must name the witness, demonstrate that the witness was available to testify and would have testified, set out the content of the witness's proposed testimony,

and show that the testimony would have been favorable to the defense." *Day*, 566 F.3d at 538;

*Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Upon this record, while Hamilton has

identified approximately twenty witnesses that she maintains would have established her innocence,

she has not identified with specificity the content of each witnesses' proposed testimony, and has not

shown that the testimony would have been favorable. Moreover, the record shows that the witnesses

that Hamilton suggests could have and should have been contacted by counsel, testified at trial as

Government witnesses. The record further shows that counsel conducted a thorough examination

of each witness, including Steve Williams, and that each cross examination by Mr. Pena was

consistent with the theory of the case as explained during opening argument by Mr. Pena:

> It's a central theme of our defense, is that there are a number of parties involved in
> all these transactions. There are lawyers. Russell Jones is a lawyer supervising Miss
> Nathan and she is the escrow officer. She has to have a license under that attorney
> who supervises her. There are attorneys that work for the title company. There are
> people that we anticipate will testify: Steve Williams for Chicago Title, who has a
> good deal of direct involvement in guiding her in how she should do her job. None
> of these people were indicted and the central theme against this conspiracy allegation
> is that the other people who were involved or more involved or had supervisory roles
> are not charged with a crime. (Document No. 282, p. 535).

In addition, the record refutes Hamilton's allegation that Mr. Pena failed to show that this was her

first commercial transaction and that she did not own a title company. On cross examination, Steve

Williams testified that this was Hamilton's first commercial closing. (Document No. 287, p. 1777).

To the extent that Hamilton alleges that counsel failed to review documents, she fails to

identify with specificity the documents that counsel failed to review that were disclosed by the

Government during discovery or how counsel was unprepared for trial as a result of his failure to

review documents. The record controverts Hamilton's conclusory allegations. Counsel's thorough

examination of the Government's witnesses showed his familiarity with the exhibits. Moreover, to

21

the extent that Hamilton suggests that she identified documents that counsel could have and should have used, including documents from her own files such as checks and a fax transmission, the record shows that the documents in question were the subject of a Motion in Limine that was argued in tandem by Mr. Pena and Nathan's counsel, Mr. Chernoff.  Mr. Pena referred to this as an "extremely document intensive case." (Document No. 282, P. 530-31).  Mr. Pena argued that the documents were relevant to show that Hamilton was guided by others about how to conduct the financial transactions and to show that she closed the transactions under the supervision and guidance of others at Chicago Title, who were not charged with a crime, and who, according to Mr. Pena and Mr. Chernoff, had a greater role in the offenses charged in the Indictment, especially when compared to that of Hamilton.  (Document No.282, pp. 529-531, 536, 538).  In addition, Hamilton further suggests that because counsel "showed a lack of interest," failed to develop crucial evidence at trial, failed to properly cross-examine government witnesses, and failed to inspect the Government's evidence before it was admitted (Document No. 381, p. 12), she was wrongly convicted of the charged offenses.  Hamilton's § 2255 Motion and Memorandum and Response are based on conclusional assertions of counsel's alleged inadequacies.

A review of the record shows that Mr. Pena was prepared for trial.  He effectively examined the Government witnesses in a manner consistent with Hamilton's defense, namely, that she was not in a position to have committed the offenses charged in the Indictment without the help or direction of others who were not charged in the Indictment.  To the extent that Hamilton suggests the evidence was insufficient to support her convictions, the Fifth Circuit reached the opposite conclusion.  The Fifth Circuit wrote:

Nathan and Hamilton both acknowledge that their services were used in a scheme to

defraud Banco Popular.  They argue, however, that the Government did not prove that they had the knowledge and specific intent to commit the bank fraud and money laundering counts with which they were charged....At trial, the Government introduced evidence that Hamilton had altered documents during the closing, that Nathan had instructed lenders to make out checks to a third party, that both appellants had been involved with similar transactions in the past, and that Appellants profited from the disbursement of escrow funds at closing to their jointly-owned companies. Based on the strength and nature of this and other circumstantial evidence described in the record, it was reasonable for the jury to infer that Appellants knew of and had the specific intent to commit the charged crimes.  (Document No.  316).

Next, Hamilton claims that "counsel failed to object to government motion to attach two unrelated transactions to the indictment, I believe that [sic] separate indictment was needed to bring those transactions to court."  (Document No.  344, p.  5).  Similarly, Hamilton further alleges that counsel "failed to request to suppress the two unrelated files to the indictment, which increased my sentence level, even when asked by the judge if he ha[d] any objection he said no."  (Document No.  344, p.  6).  Although Hamilton does not specify the transactions in question, it appears that the transactions in question were the BlumMart loans and the Waller MiniMart loans.  To the extent that Hamilton suggests no objection by Mr. Pena was made to the introduction of testimony about the BlumMart and Waller Minimart loan losses, the record contradicts this assertion.  Judge Harmon denied defense attempts to preclude the introduction of the evidence pursuant to Rule 404(b), (See Document No.  286, pp.  1513-1515), but gave the jury a limiting instruction concerning the Rule 404(b) evidence:

> During this trial, you have heard evidence of acts of the defendants which may be similar to those charged in the indictment, but which were committed on other occasions.  You must not consider any of this evidence in deciding if the defendants committed the acts charged in the indictment.  However, you may consider this evidence for other, very limited, purposes.
>
> Evidence of some other act of a like nature may not be considered for any other purpose whatsoever unless you first find that the other evidence in the case, standing

alone, establishes beyond a reasonable doubt that the accused did the particular act charged in the particular count of the indictment then under deliberation.

If you find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the particular count under deliberation, then you may consider evidence of the similar acts allegedly committed on other occasions to determine:

whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment; or

whether the defendant had a motive or the opportunity to commit the acts charged in the indictment; or

whether the defendant acted according to plan or in preparation for commission of a crime; or

whether the defendant committed the acts for which he is on trial by accident or mistake.

These are the limited purposes for which any evidence of other similar acts may be considered. (Document No. 178, 3-4).

In sum, given that the 404(b) evidence was objected to at trial by defendant's counsel, and given the limiting instruction that was given, Hamilton has not shown that counsel's performance fell below that of *Strickland*.

Hamilton also claims that counsel was ineffective for failing to request a new jury pool based on objectionable statements made by Nathan's counsel, Mr. Chernoff, that biased the jury pool. In particular, Hamilton argues that counsel could have and should have moved for a new jury pool after Nathan's counsel questioned the jury about their feelings in general about Nigerians, and also whether anyone recognized either Nathan or Hamilton. According to Hamilton, she was prejudiced because counsel called into question how the prospective panel felt about Nigerians, and that had counsel not brought up this subject, the jury would not have been tainted against her. In addition, she claims that

she was prejudiced when counsel inquired about whether any of the prospective jurors recognized the defendants, and one juror affirmatively responded that Hamilton looked familiar to her. This prospective juror was questioned at the bench about any knowledge she might have had about Hamilton or about how she felt about Nigerians in general. The Government counters that the questioning by either Nathan's counsel or Hamilton's counsel was a tactical decision and that Hamilton cannot show she was prejudiced by counsel's performance during voir dire.

It is undisputed that Hamilton's counsel and Nathan's counsel jointly participated in the voir dire process. With respect to Hamilton's contention that she was prejudiced by the failure of counsel to object to the questioning of the voir dire panel about their impressions of Nigerians, the record shows Hamilton cannot show she was prejudiced by counsel's failure to object to the questioning of the voir dire panel. To the contrary, based on the questions posed, Mr. Chernoff was able to winnow out jurors that could have been biased against Hamilton and Nathan based on their ethnicity. Such decisions are strategic and cannot serve as a basis of an ineffective assistance of counsel claim. The record also shows that prospective jurors were questioned in detail about their overall impressions of Nigerians, Nigerians and bank fraud, and whether such feelings could consciously or subconsciously enter into their determination of guilt or innocence. (Document No.282, pp. 642-645). Based on this line of questioning, Mr. Pena and Mr. Chernoff were able to strike as potential jurors those who had expressed negative impressions of Nigerians.

Likewise, to the extent that Hamilton suggests she was prejudiced due to the panel being asked if anyone recognized Hamilton, the record shows that one potential juror stated that Hamilton looked familiar. (Document No.282, p. 632). The record shows Mr. Pena questioned the prospective juror outside of the presence of the jury panel. The prospective juror stated that she

recognized Hamilton as being her closing agent, and based on this recognition, the following exchange took place between Mr. Pena and the prospective juror:

> Mr. Pena: Do you remember anything about the closing experience that would have an effect on the way you decide the case or today do you have anything negative or positive, anything that would have an effect on your ability to be a juror in deciding Florence Nathan's case?
>
> Prospective juror: Yes.
>
> Mr. Pena: What is that?
>
> Prospective Juror: I wouldn't have any problem with her per se, but the gentleman that I sold the house to was another Nigerian, and I had lots of problems with him and the deal came through her.
>
> Mr. Pena: So, you would—the fact that she helped facilitate the deal that you had a bad experience with–you're going to attribute some of those feelings those, negative feelings, towards her?
>
> Prospective Juror: I wouldn't go so far as to say that, but I don't think I could keep an open mind. I don't think I could be fair to her.
>
> Mr. Pena: Okay. (Document No. 282, pp. 699-700).

Given these responses, Mr. Pena moved to strike the prospective juror. Upon this record, Hamilton has not shown that counsel's performance fell below the standards of *Strickland*. The juror was questioned outside the presence of the jury panel and she was stricken based on her responses. Hamilton has not shown that the panel was biased based on the questioning by Mr. Chernoff. Likewise, Hamilton has not shown that counsel was ineffective for failing to request a new jury panel.

To the extent that Hamilton suggests that counsel was ineffective for failing to object when a juror had a conversation with a paralegal who was employed by the Government, the record shows that the matter was immediately brought to attention of the Court, and not days later as claimed by

Hamilton.  According to the Government, the paralegal had an inadvertent conversation with one of the jurors in the parking garage about how to get out of the parking garage.  Neither Mr. Pena nor Mr. Chernoff objected since the subject matter of the conversation was not relevant to the trial. (Document No. 286, p. 1512).  Again, Hamilton has not shown there was any legal basis for counsel to object to the juror contact given the limited nature of the conversation.

To the extent that Hamilton suggests that counsel was ineffective because of the collegial nature of exchanges between Government counsel and Mr. Pena and Mr.  Chernoff, Hamilton has not identified with specificity how she was prejudiced by Mr.  Pena comporting himself in a civil and polite manner.  Hamilton's conclusory allegation of ineffective assistance of counsel based on counsel not acting acrimonious or hostile to the Government's attorney is insufficient to establish a valid claim.  *Green v.  Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998), *cert.  denied*, 525 U.S. 1174 (1999) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

Finally, Hamilton contends that appellate counsel were ineffective by failing to raise claims on direct appeal about trial counsel's ineffectiveness.  Generally, ineffective assistance of counsel claims are not considered on direct appeal but are considered through federal habeas review.  *United States v.  Gulley*, 526 F.3d 809, 821 (5th Cir.  2008) (The general rule in this Circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations.").  Even assuming that counsel could have and should have raised a claim, there was no basis for such a claim.  As such, Hamilton's ineffectiveness of appeals counsel claim fails.

Hamilton further argues that the evidence was insufficient to support her conviction.

According to Hamilton, the evidence was insufficient to support the finding that she altered the title commitment documents in an effort to defraud Banco Popular.  Hamilton maintains she could not have altered the documents because she did not have access to the documents or the capability to alter them.

The Government responds that Hamilton is not entitled to relief on her sufficiency of the evidence claim because such claims are not cognizable under § 2255.  *United States v.  Forrester*, 456 F.2d 905, 907 (5th Cir. ), *cert.  denied*, 409 U.S. 856 (1972); *United States v.  Garcia*, 68 F.3d 466 (5th Cir.  1995).  Upon this record, the Government's argument that claims of this nature are not cognizable is well taken.  Moreover, even assuming that such a claim was cognizable in a § 2255 proceeding, upon this record Hamilton would not be entitled to relief because she raised the issue on direct appeal and the Fifth Circuit Court of Appeals concluded that the evidence was sufficient to support her conviction. The law is clear that issues raised and disposed of in a previous appeal from a judgment of conviction are not considered in a habeas proceeding.  *United States v.  Kalish*, 780 F.2d 506, 508 (5th Cir. ), *cert.  denied*, 476 U.S. 1118 (1986); *United States v.  Rocha*, 109 F.3d 225, 229 (5th Cir.  1997).

Hamilton next argues that Steve Williams and several other Government witnesses testified untruthfully at trial.  According to Hamilton, she had nothing to do with document recording and as a result, any testimony by Dan McCrary, Russell Jones, Chuck Lummis, and Tommy Rice and others to the contrary was false.  Likewise, she claims that Steve Williams instructed her to modify the commitment and that his testimony to the contrary was false.

Pursuant to 28 U.S.C. § 2255, a federal prisoner may challenge his conviction on the basis that his " sentence was imposed in violation of the Constitution or laws of the United States, or

that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." Motions brought pursuant to § 2255 are reserved for claims of constitutional or jurisdictional significance. *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1081); *Limon-Gonzalez v. United States*, 499 F.2d 936, 937 (5th Cir. 1974).

When claims of constitutional or jurisdictional import are not raised on direct appeal, the claims are procedurally defaulted, and can only be considered in a § 2255 proceeding if a movant can show cause for his failure to raise his claims on appeal, and actual prejudice resulting from the alleged errors. *United States v. Placente,* 81 F.3d 555, 558 (5th Cir. 1996) (" [A] defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors."); *United States v. Gaudet,* 81 F.3d 585, 589 (5th Cir. 1996) (" When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error."); *United States v. Acklen,* 47 F.3d 739, 741-42 (5th Cir. 1995) (" Because a challenge under section 2255 'may not do service for an appeal,' a movant may not raise constitutional or jurisdictional issues for the first time on collateral review without establishing both 'cause' for his procedural default and 'actual prejudice' resulting from the error."); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (" A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude … and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error."), *cert. denied*, 502 U.S. 1076 (1992). Procedurally defaulted claims

29

also may be considered for the first time in a § 2255 proceeding if the movant can show that she

is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998) (" Where a defendant

has procedurally defaulted a claim by failing to raise it on direct review, the claim may by raised

in habeas only if the defendant can first demonstrate either ' cause' and actual prejudice … or that

he is ' actually innocent.' ")

      Here, even assuming that Hamilton could establish cause for her failure to raise this claim

on direct appeal, namely that counsel could have and should have raised the issue on direct appeal,

she cannot show prejudice which has resulted from the alleged error.  Accordingly, Hamilton' s

claim is procedurally barred from review in this § 2255 proceeding.

      Moreover, even if this claim was not procedurally barred and Hamilton had, on direct

appeal, argued that witnesses testified untruthfully at trial, especially Steve Williams, she has not

shown that the Government used false or misleading testimony.  With respect to Steve Williams'

testimony, at sentencing Hamilton' s base offense level was increased by two levels for

obstruction of justice.  The two level upward adjustment was based on Hamilton' s trial testimony

about Steven Williams, which constituted perjury.  Hamilton testified that she had been instructed

by Steve Williams to change the title commitment.   Steven Williams testified that he had not

instructed Hamilton to alter the documents in question.  (Document No. 287, p. 1720 and

Document No. 208, p. 394).      The law is clear that " a conviction obtained by the knowing

use of perjured testimony if fundamentally unfair, and must be set aside if there is any reasonable

likelihood that the false testimony could have affected the judgment of the jury." *United States*

*v. Agurs*, 427 U.S. 97 (1976).  To prevail on a claim that the Government used perjured

testimony, Hamilton must show (1) that the evidence presented was false; (2) that the evidence

was material; and (3) that the prosecution knew that the evidence was false. *Carter v. Johnson*, 131 F.3d 452, 458 (5th Cir. 1997), *cert. denied* 523 U.S. 1099 (1998); *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993); *cert. denied*, 513 U.S. 830 (1994). To demonstrate that the perjured testimony was material, the perjured testimony is material " only where ' the false testimony could in any reasonable likelihood have affected the judgment of the jury.' " *Knox v. Johnson*, 224 F.3d 470, 478 (5th Cir. 2000) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)), *cert. denied*, 532 U.S. 975 (2001). Discrepancies in testimony alone do not establish the knowing use of perjured testimony. *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *see also Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) (" Conflicting or inconsistent testimony is insufficient to establish perjury."). Here, upon this record, Hamilton has not shown the use of perjured testimony was based on prosecutorial misconduct. At best, Hamilton appears to suggest that to the extent a Government witness affirmatively linked her to the activities described in the Indictment, that testimony was false and that the Government knew the testimony was false. It is undisputed that Steve William' s testimony contradicted that of Hamilton. That alone does not show that the Government offered perjured testimony. At trial, Steve Williams was cross- examined about the documents that Hamilton argues Steve Williams instructed her to alter. He denied this. Ultimately, it was the province of the jury to weigh the testimony. With respect to this, the jury was instructed as follows:

> You are the sole judges of the credibility or " believability" of each witness and the weight to be given the witness' s testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe what each person had to say, and how important that testimony was. In making that decision I suggest that you ask yourself a few questions: Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal

interest in the outcome of the case?  Did the witness have any relationship with either the government or the defendant?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to understand the questions clearly and to answer them directly?  Did the witness's testimony differ from the testimony of other witnesses?  These are a few of the considerations that will help you determine the accuracy of what each witness said.

In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other.  Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.  Your job is to think about the testimony of each witness you have heard and to decide how much you believe of what each witness had to say.

                    *                    *                    *

The testimony of a witness may be discredited or "impeached" by showing that the witness testified falsely concerning material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trisl.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true.  You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that any witness has been discredited in this manner, then it is your exclusive right to give the testimony of that witness whatever weight, if any, you think it deserves.

A defendant has a right not to testify.  If a defendant does testify, however, the defendant's testimony should be weighed and considered, and the defendant's credibility determined, in the same way as that of any other witness.  (Document No.  178, pp.  4-6).

Therefore, it was within the province of the jury to afford more weight to Steve William's

testimony than that of Hamilton, or for that matter, to any of the Government's witnesses that

Hamilton has suggested testified falsely or fraudulently.  Moreover, even assuming that Steve

William's had perjured himself, Hamilton has not shown that the Government had knowledge

of the perjury.   To the extent Hamilton appears again to challenge the sufficiency of the evidence to support her conviction, this matter was raised on direct appeal and the Fifth Circuit concluded that the evidence was sufficient to support her convictions.   In conclusion, upon this record, Hamilton has not shown that the government knowingly used perjured testimony.   Accordingly, her claim of the government's use of perjured testimony is procedurally barred, and is also subject to dismissal on the merits.

Hamilton also claims that the juror pool was biased against her.   She claims that a prospective juror was biased against her and that she tainted the jury pool.   She also alleges that the prospective jury pool was tainted as a result of questions posed by Nathan's counsel about their experiences and impressions of Nigerians.   Hamilton did not raise either ground in her direct appeal.   She has, however, raised the claims in relation to her allegations of ineffective assistance of counsel.   As discussed above, Hamilton has not established cause or prejudice or actual innocence to overcome the procedural default of the claim given that her ineffective assistance of counsel claim failed.   As such, the claim is procedurally barred from review.   Even assuming that the claim was not procedurally barred, the record clearly shows that Hamilton is not entitled to relief on this claim.   The record shows that with respect to the prospective juror who recognized Hamilton, the prospective juror was questioned outside the presence of the jury panel, and was stricken.

As far as the questioning of the panel about their impressions of Nigerians, again, the record shows that through this line of questioning, potential jurors with adverse opinions were struck. Indeed, due process only requires that jurors be able to "lay aside their impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" *Skilling v.   United States*,

___U.S.___, 130 S.Ct. 2896, 2925 (2010)(quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).
Given that none of the prospective jurors who expressed an inability to act impartially were seated,
Hamilton's due process claim fails. Finally, to the extent that Hamilton alleges a due process
violation based on the civil exchanges between defense counsel and counsel for the Government, she
cites to no authority that precludes civility between counsel, nor has she made a showing that she was
prejudiced by the encounters in question. Hamilton's due process allegations fail.

Finally, Hamilton claims the Government withheld exculpatory evidence. According to
Hamilton, the Government knew that Chicago Title had been fined by the Controller of the Currency
and the Texas Insurance Board for conducting flip transactions and she suggests that the Government
kept this information from the defense. The Government counters that the claim is procedurally
barred and, even assuming that it was not procedurally barred, the claim is without merit. The
Government also asserts that information was known to defendant prior to trial and the matter was
argued at trial in the context of Motion in Limine. Judge Harmon denied Hamilton's attempts to
introduce the evidence as it did not involve the Chicago Title office that was involved in the instant
transactions, none of the same individuals involved in the case at bar were involved and the events
happened in 2005, well after the events alleged in the Indictment occurred.

The law is clear that "the suppression by the prosecution of evidence favorable to an accused
upon request violates due process where the evidence is material either to guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83
(1963). To establish a *Brady* violation, Hamilton must show that (1) the prosecution suppressed
evidence; (2) the evidence was favorable to the defendant because it was either exculpatory or
impeaching; and (3) the evidence was material. *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir.

2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433-38 (1995).

The record controverts Hamilton's assertion that the Government knew about the earlier action taken against Chicago Title and failed to disclose it. (Document No. 282, p. 538, Document No. 287, 1629-1631). The matter came up in pretrial proceedings and during trial in connection with testimony of Steve Williams. The Government noted that "at the start of trial, the Court granted a motion in limine in connection with a consent order that Chicago Title had entered into with the State and Office of the Comptroller of the Currency. (Document No. 287, p. 1629). Mr. Chernoff argued that defense should be able to question Steve Williams about this because Steve Williams was the person that Hamilton would have spoken with to determine how to do certain things with regards to closings that were at issue." (Document No. 287, p. 1629). Mr. Chernoff requested that he be allowed to ask Steve Williams about "whether he facilitated the flip transactions and simultaneous closing with Florence. Did he give her information on how to do that and, frankly permission to do that[,"] and ask "[whether] simultaneous closing is something that Chicago Title has traditionally performed for various entities in the past..." (Document No. 287, pp. 1629-30). The defense argued this was relevant to Williams' credibility given that "part of our defense is that Florence Hamilton did what she was told, not what she decided, and that's why that becomes important." *Id.* Mr. Pena amplified on this argument as follows:

> Mr. Pena: It is my understanding that the Texas Board of Insurance had an investigation into fraudulent transactions in commercial real estate and that Chicago Title was required to change the manner in which they conducted their business and this is subsequent to the transaction that happened in the year 2000.
>
> Steve Williams is the person who Florence calls for guidance on a daily basis from Chicago Title. Steven Williams reports to the attorneys— David Ratchford at

> Chicago Title but we have instructions and written–and memos directly from Steve Williams guiding Florence, showing that he has known of what's happening and showing her how to get it done. (Document No. 287, p. 1631).

The Government responded that Mr. Williams was not going to deny that Chicago Title did flip transactions. (Document No. 287, p. 1631). Thereafter, when Hamilton testified, Mr. Pena again tried to argue that Chicago Title engaged in the type of activities alleged in the Indictment, and that Chicago Title had been fined six million dollars. (Document No. 208, p. 3941). Upon this record, Hamilton has not shown a *Brady* violation. The record clearly shows that the Government did not withhold exculpatory evidence, and that the information was disclosed and was available to the parties.

Hamilton next argues that she is actually innocent of the money laundering offenses in light of the decision by the United States Supreme Court in *United States v. Santos*, 553 U.S. 507 (2008). Hamilton suggests that she was not aware that any expenses that were paid were the profits of bank fraud involving the illegal land flip transaction. The Government responds that Hamilton's reliance on *Santos* is misplaced.

The *Santos* decision involved money laundering under 18 U.S.C. 1956(a)(1)(A)(I). In *Santos*, the Court considered whether the term "proceeds" in the federal money laundering statute, 18 U.S.C. 1956(a)(1), means "receipts" or "profits." *Id.* at 509. *Santos* involved money laundering in which the gross proceeds from an illegal lottery were used to pay employees and lottery winners. *Santos*, 553 U.S. at 509. Because the transactions involved paying the costs of running the illegal lottery, they involved the lottery's gross receipts but not its profits. In a divided opinion, the Supreme Court affirmed the Seventh Circuit's reversal of Santos's money laundering conviction. In a 4-1-4 decision, the plurality of Justices Scalia, Souter, Thomas and Ginsburg, held that the term "proceeds," which

36

was undefined in the statute, was ambiguous and without legislative history adequate to clarify its meaning. *Id.* at 511-12. Applying the rule of lenity, the plurality held that "proceeds," as used in § 1956(a)(1) means "profits," not total "receipts," from the criminal activity conducted. Applying this holding, the plurality concluded that "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid." *Id.*, at 517. Justice Stevens concurred in the judgment to the extent that with respect to the gambling enterprise, Congress had not indicated its intent as to whether "proceeds" should be defined to include all "receipts" or just the "profits." *Id.* at 524-26 (Stevens, J., concurring). Justice Stevens declined to join the plurality in its holding that "proceeds" as used in §1956 always means "profits" under the rule of lenity. *Id.* Rather, Justice Stevens stated that "proceeds" must mean "profits" whenever a broader definition would "perverse[ly] result in a "merger problem." 533 U.S. at 527, 528 n. 7. Because *Santos* was a 4-1-4 decision, the application of the case has not been clear or straightforward.[3] "The precedential value of *Santos* is unclear outside the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts." *United States v. Brown*, 553 F. 3d. 768, 783 (5th Cir. 2008), *cert. denied*, 130 S.Ct. 246 (2009). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted);

---

[3] Congress, on May 29, 2009, amended the money laundering statue to expressly define proceeds to include gross receipts. 18 U.S.C. § 1956(c)(9) (2009), and a result *Santos* has been superseded. This amendment does not apply to the instant action, which must be decided under the old statute and *Santos*.

*Garland v. Roy*, 615 F.3d 391, 399 (5th Cir. 2010)("Justice Stevens' concurrence controls and therefore determines the scope of the Court's holding.").  Justice Stevens' concurrence instructs that "the same word can have different meanings in the same statute. [Therefore], this Court need not pick a single definition of "proceeds" applicable to every unlawful activity, no matter how incongruous some applications may be." *Santos*, 533 U.S. at 525 (Stevens, J., concurring) (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004)).  Given this caveat, *Santos* has been applied differently by Circuit courts.  In *Garland v. Roy*, 615 F.3d 391, 403 (5th Cir. 2010),[4] a case which involved money laundering with an underlying pyramid scheme, the Fifth Circuit Court of Appeals discussed the various Circuit positions as follows:

> The Fourth, Eighth and Eleventh Circuits have held that in light of Justice Stevens' concurrence, *Santos* defines "proceeds" as "profits" only when courts are presented with the particular facts of *Santos*, where the petitioners were convicted of laundering money from the "unlawful activity" of running an illegal gambling operation.  The Third and Seventh Circuits have concluded that Justice Stevens' concurrence indicates "proceeds" as "profits" only when courts are presented with the particular facts of *Santos*, where the petitioners were convicted of laundering money from the "unlawful activity" of running an illegal gambling operation.  The Third and Seventh Circuits have concluded that Justice Stevens' concurrence indicate "proceeds" must be defined as "profits" any time the legislative history of the money-laundering statute does not affirmatively indicate otherwise.  Analogous to the first step of Justice Steven' bifurcated rule, the Ninth circuit and, likely, the First Circuit have held that "proceeds" must be defined "profits" any time the "merger problem" articulated in *Santos* would result if "proceeds" is defined as "gross receipts."  Finally, similar to both steps in Justice Stevens' rule, the Sixth Circuit has held, "'proceeds' does not always mean profits, as Justice Scalia concluded; it means profits only when the § 1956 predicate offense creates a merger problem that *leads to a radical increase* in the statutory maximum sentence *and* only when nothing in the legislative history suggests that Congress intended such an increase.' (citations omitted) (emphasis in original).

---

[4] *Garland* involved a pyramid schemer's payments to early investors to keep his fraud going.  The Fifth Circuit suggested that those payments had possibly merged with the underlying mail and securities fraud charges because the same transactions gave rise to both the underlying fraud charges and those for money laundering.  *Garland*, 615 F.3d at 400, 404.

The Fifth Circuit suggested that *Santos* may apply more broadly, i.e, to other predicate offenses than illegal gambling, and that it was retroactively applicable to cases on collateral review.  Under the facts of *Garland*, the Fifth Circuit concluded that Justice Steven's concurrence required a bifurcated approach, which required the court to determine first whether giving "proceeds" a broad interpretation to mean "receipts" would result in merging the underlying illegal activity with the money laundering charge.  Second, if there is a merger problem, the court must then examine the legislative history of the money laundering statue to determine if "proceeds" should be defined as "profits" in a particular case.  *Id.*  at 403-04.  The Fifth Circuit has made clear that *Garland's* bifurcated test need not be applied to all challenges to the money laundering statute under *Santos*.  For example, in *Wilson v. Roy,* 643 F.3d 433 (5th Cir.  2011), the Fifth Circuit held that in the context of narcotics offenses which include money laundering of the proceeds of the sales of illegal drugs, the bifurcated analysis did not apply to drug offenses, and as a result *Santos* did not undermine the money laundering convictions.  *Id.*  at 436-37 & fn.  3.

The Government argues that Hamilton's conviction falls squarely within Justice Stevens' plurality opinion because Hamilton used gross revenues from the bank fraud to commit the offense of money laundering.  According to the Government, the Fifth Circuit upheld a money laundering conviction where the definition of proceeds under *Santos* was not submitted to the jury, as was the case here.

In *United States v.  Cooks*, 589 F.3d 173, 178-79, 181-82 (5th Cir. 2009), *cert.  denied*, 130 S.Ct.  1930 (2010), the defendant participated with others in a scheme to defraud mortgage lenders.  Cook recruited real estate investors to serve as "straw purchasers" for homes.  *Id.*  at 178.  Cook and two mortgage brokers created loan applications for the straw purchasers and misrepresented to the

lending institution that the house was worth more than its real value and that the "straw purchaser" qualified for the loan.  *Id.*  Cook appealed his conviction and argued that his money laundering conviction was invalid under *Santos* because the jury was not instructed that the word "proceeds" meant "profits" and not receipts.   The Fifth Circuit first found this argument unpersuasive.  In so doing, the Fifth Circuit recognized the uncertain precedential value of *Santos*.  Second, relying on *United States v. Brown*, 553 F.3d 768, 784-85 (5th Cir. 2008), *cert. denied*, 130 S.Ct.  246 (2009), in which the Fifth Circuit held that "in cases where the evidence indicates that the specified unlawful activity was profitable and the charged transactions incurred some modicum of profit, a failure to include a profits definition of proceeds in the jury instructions does not meet the plain error standard," *id.* at 180, the Fifth Circuit found that because the evidence at trial showed that the mortgage loan amount was based on the inflated value amount and that after the closing Cook sold the home to the straw purchaser for more than he bought it with the difference being pure profit for Cook, that the failure to include a "profits" definition of proceeds in the jury instructions did not meet the plain error standard.

The Government argues that Hamilton, after the bank fraud was committed, directly profited from the scheme.  The Government maintains it is of no consequence that there was no proof that Hamilton used the "profits" of bank fraud before finding her guilty of the money laundering charge.

In *Cotton v. Keffer*, Civil Action No.  4:10-CV-545-Y, 2011 WL 3611489 (N.D. Tex.  April 25, 2011), Cotton was convicted of bank fraud and money laundering. In her § 2241 petition, she argued that she was actually innocent of money laundering under 18 U.S.C. § 1957 in light of *Santos*. The Court found her argument without merit.  The Court wrote: "[a]ssuming, without deciding that *Santos* applies to § 1957, Cotton fails to explain how the transactions charged as money laundering

were essential expenses, and not profits, of the bank frauds and false statement offenses."

Here, applying *Santos* to Hamiltons' money laundering conviction, she has not shown that she is actually innocent of money laundering under *Santos*. Hamilton's bank fraud offense was defined by the obtaining of money fraudulently. In contrast, the money laundering offense was defined by transferring of the proceeds after the fraud was complete for purposes other than the expenses of the bank fraud. Hamilton has not shown that the same transaction was used to prove both the underlying unlawful activity (bank fraud) and the money laundering charges. *Garland*, 615 F.3d at 404. Rather, Hamilton made the transfers of money from the escrow account, the transactions of money laundering, with the money she knew was the result of bank fraud *after* the predicate offense was complete. *See also United States v. Halstead*, 634 F.3d 270, 280-81 (4th Cir. ), *cert. denied*, 131 S.Ct. 3043 (2011); *United States v. Kasprowicz*, No. 10-30334, ___Fed.Appx.___, 2011 WL 3586111(9th Cir. Aug. 16, 2011). Hamilton's claim that she is actually innocent of money laundering under *Santos* fails.

Finally, Hamilton claims she is entitled to relief under the Supreme Court decisions in *Skilling v. United States*, ___U.S.___, 130 S.Ct. 2896 (2010), *Black v. United States*, ___U.S.___, 130 S.Ct. 2963 (2010), and *Weyhrauch v. United States*, ___U.S.___, 130 S.Ct. 2971 (2010). These cases involved the "honest services" fraud statute, 18 U.S.C. § 1346. In *Skilling*, the Supreme Court held that 18 U.S.C. § 1836 criminalizes only bribery and kickback schemes. Because Hamilton was not convicted of honest services fraud under § 1846, she is not entitled to relief under the Supreme Court decisions in *Skilling, Black,* or *Weyhrauch*. To the extent that Hamilton confuses the adjustment of her base offense two levels for abuse of trust, challenges to the application of the sentencing guidelines are not properly made in a § 2255 motion. *United States v. Williamson*, 183

F.3d 458, 462 (5th Cir.  1999) (claims that the sentencing guidelines were misapplied are not cognizable in a § 2255 motion)

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion (Document No. 362) be GRANTED, and that Movant Yerisoibi Florence Hamilton's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.  344) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 12th  day of December, 2011.

_Frances H. Stacy_
Frances H. Stacy
United States Magistrate Judge